## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JAMES QUINN d/b/a Q FINANCIAL SERVICES; FAHMIA, INC.; and PRINZO & ASSOCIATES, LLC, individually and on behalf of all others similarly situated, | **20-cv-4100** |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| JPMORGAN CHASE BANK, N.A., d/b/a CHASE BANK; and JPMORGAN CHASE & CO., DOES 1 through 100, inclusive, | |
| Defendants. | |

Plaintiffs James Quinn d/b/a Q Financial Services ("Q Financial"), Fahmia, Inc. ("Fahmia") and Prinzo & Associates, LLC ("Prinzo") (collectively, "Plaintiffs") bring this Class Action Complaint and Demand for Jury Trial against Defendant JPMorgan Chase Bank, N.A. ("Chase Bank") and JPMorgan Chase & Co. ("JPMorgan" and together with Chase Bank, "Defendants") Does 1 through 100, inclusive, seeking compensation from Defendants, who refuse to comply with the CARES Act that requires them to pay out of the compensation it received for processing PPP loans, for services Plaintiffs and a large number of other agents rendered on behalf of recipients of Small Business Administration ("SBA") emergency loans.  Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief.

## NATURE OF THE ACTION

1.      In response to the shut-down of virtually every business across all non-essential industries due to COVID-19, the federal government has raced over the past few months to ease the impact of the shut-down on the U.S. economy.  In order to keep afloat small businesses, and to encourage those businesses to avoid massive worker layoffs and furloughs further damaging the economy, Congress decided to create an economic relief program to distribute money to small businesses.

2.      In order to distribute the money swiftly to small businesses, Congress decided to utilize the nation's financial institutions to take applications and distribute the funds that would be fully guaranteed by the federal government.  However, in order to avoid delay, Congress decided that the financial institutions would not be required to verify the accuracy of the applications.  Instead, the burden to provide accurate information was put directly and solely on the small businesses submitting applications.

3.      The applications would need to be simple and the amount of the economic relief would be based on historical payroll information with specific limitations.  However, as the lenders would not be verifying the information, there would need to be a number of representations and certifications, and specific warnings because that failure to provide true and accurate information could subject the small business owner to five years in prison and a $250,000 fine.

4.      In order for these small businesses to be able to make timely, truthful and accurate applications, Congress understood that small businesses would need assistance from the nation's professional accountants, tax preparers, financial advisors, attorneys, and other such agents normally relied upon by small businesses.

COMPLAINT AND DEMAND FOR JURY TRIAL

5.      On March 27, 2020, Congress passed the SBA's Paycheck Protection Program ("PPP") which initially authorized up to $349 billion in forgivable loans to small businesses to cover payroll and other expenses (PPP I).  After the initial funds quickly dried up, Congress added $310 billion additional dollars to the program (PPP II).

6.      The PPP was designed to be fast and straightforward, allowing business to apply through SBA-approved lenders and await approval.  Once approved, lenders would be compensated in the form of a generous origination fee paid by the federal government, with the requirement that the lender would be responsible for paying the fee owed to the loan applicant's agent (*e.g.,* attorney or accountant). However, the PPP did not require nor layout any specific form or process to be followed between the lender and the agent for the agent to qualify to receive their portion of the compensation.  Any such requirement would lead to delays as the lender and agent negotiated and entered into an agreement.  This kind of delay is exactly the type that would cause unacceptable devastating results for the borrowers. Not only would this potentially cause a dangerous delay in the lending, it created the unacceptable incentive for the lenders to prioritize applications without agent fees over those with agent fees.  It was antithetical to the whole purpose of the PPP to allow conflict over fees between the agent and the lender to slow down or eliminate funds that were vital for both the small business owner AND the employees and consumers that relied on the small business for income.

7.      Both the lender and the agents were specifically forbidden by the PPP from charging the small business borrower any amounts for the loan or the assistance in preparing the application for the loan.  The amount of the total compensation and the allocation between the lender and the agents assisting the borrowers in preparing the application was specifically set out in the PPP.  For the majority of loans (those under $350,000), the lender would receive an amount equal to 5% of the loan as compensation, and if the borrower used an agent such as a CPA or accountant, the lender was to pay an

COMPLAINT AND DEMAND FOR JURY TRIAL

amount equal to 1% of the loan amount to the agent.  In other words, compensation from the federal government to the lender and the borrower's agent was allocated as 80% to the lender and 20% to the CPA or attorney assisting the small business borrower.

8.     Defendants are the largest national banking entities in the country and are headquartered in Manhattan, New York City.  They have more than 5,100 branches and specialize in consumer and commercial banking.  Defendant reported that it approved 239,000 applications totaling over $29 billion in borrowed funds, securing more funding for small businesses than any other lender.[1]  The average PPP loan approved by Defendants was approximately $121,339.  Assuming a conservative average fee of four percent, they have, accordingly, been allocated over $870 million in origination fees, from which they were required to pay the agents who assisted the borrowers in submitting applications.

9.     However, Defendants apparently decided that they do not need to complete the final step of the process and based on information and belief have refused to pay the agents who assisted PPP loan recipients with their applications.  This practice seemed to be a deliberate scheme from the beginning as even though they were required to pay agents that assisted in the application process, Defendants did not set up a structure or ask any questions to determine whether borrowers utilized an agent in completing applications.  It appears that this scheme was to claim ignorance of the existence of the agent as an excuse not to pay the agent its share of the compensation.  This refusal is harming accountants, attorneys, and other agents who dropped everything (in the midst of tax season) to assist their customers in filling out these vital loan applications correctly and in compliance with the PPP, and who were specifically only allowed to be paid for these services out of the compensation paid to the lender.  The

---

[1]     *See Paycheck Protection Program and Chase Business Bank:  Frequently Asked Questions,* available at https://recovery.chase.com/cares1/ppp-faqs1 (last visited May 26, 2020).

COMPLAINT AND DEMAND FOR JURY TRIAL

Defendants' failure to pay agents is in blatant violation of PPP regulations stating that agent fees "will be paid by the lender out of the fees the lender receives from SBA."

10.     These agents, including Plaintiffs, have no other recourse for collecting fees for assisting borrowers on PPP loan applications because the PPP regulations delegate the responsibility for paying agents to the lenders *alone*.  And yet, Defendants have disregarded the regulations and refused to pay agents who assisted small businesses in receiving PPP funds.

11.     Plaintiffs have been harmed by Defendants' practice.  As CPA firms that do payroll and other small business support functions, Plaintiffs assisted small business clients who submitted applications to Defendants and was then funded through the PPP program.  Based on information and belief, Defendants have received the 1%, 3% or 5% compensation related to these loans based upon the amount of the loan, but have not paid Plaintiffs their 1%, 0.50%, or 0.25% agent fee related to the loan.

12.     As a result of Defendants' acts and omissions, Plaintiffs and a large number of others like them have been deprived of payment for their critical work in supporting their clients' PPP loan applications.  As such, Plaintiffs bring this Class Action Complaint and Demand for Jury Trial in order to vindicate their rights and those of agents everywhere who are similarly situated, and to force Defendants to account for their blatant violation of the PPP and to pay agents their portion of the compensation.

## PARTIES

13.     Plaintiff James Quinn d/b/a Q FINANCIAL SERVICES is a Certified Public Accounting ("CPA") firm with its principal place of business located in Marco Island, Florida.

14.     Plaintiff FAHMIA, INC. is a CPA firm incorporated in California, with its principal place of business located in Torrance, California.

COMPLAINT AND DEMAND FOR JURY TRIAL

15.     Plaintiff Prinzo & Associates is a CPA firm organized in Pennsylvania, with its principal place of business located in McMurray, Pennsylvania.

16.     Defendant JPMorgan Chase Bank, N.A., is a company and subsidiary of JPMorgan Chase & Co., with its principal place of business located at 1111 Polaris Parkway, Columbus, Ohio 43240. Chase Bank conducts substantial business throughout this District and the State of New York, and throughout the United States.

17.     Defendant JPMorgan Chase & Co. is a Delaware corporation whose primary place of business is 270 Park Avenue, New York City, New York 10017.

18.     In this Complaint, references made to any act of any Defendants shall be deemed to mean that officers, directors, agents, employees, or representatives of the Defendants named in this lawsuit committed or authorized such acts, or failed and/or omitted to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of the Defendants and did so while acting within the scope of their employment or agency.

19.     Plaintiffs are unaware of the names, identities or capacities of the Defendants sued as Doe Defendants 1 through 100, but is informed and believes and thereon alleges that such fictitiously-named defendants are responsible in some manner for the damages and unfair business practices and violation of rights as described herein.  Plaintiff will amend this Complaint to state the true names, identities, or capacities of such fictitiously-named Defendants when ascertained.

**JURISDICTION AND VENUE**

20.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because, as to the proposed Class and Subclasses, (a) at least one member of the proposed Class, which consists of at least 100 members, is a citizen of a different state than

Defendants; (b) the claims of the proposed Class Members exceed $5,000,000 in the aggregate, exclusive of interest and costs, and (c) none of the exceptions under that subsection apply to this action.

21.     Personal jurisdiction over Defendants is proper because Defendants transact business in the State of New York, and a substantial number of the events giving rise to the claims alleged herein took place in New York.

22.     This Court has jurisdiction to grant declaratory relief under 28 U.S.C. § 2201 because an actual controversy exists between the parties as to their respective rights and obligations under 85 Fed. Reg. 20816 § (4)(c) (hereinafter, the "PPP regulations").

23.     Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events, acts or omissions giving rise to the claim occurred in this judicial District, including work performed by Plaintiffs on behalf of business clients within this District.  Further, Defendants are headquartered in this judicial District.

## FACTUAL BACKGROUND

24.     The spread of COVID-19 was declared a pandemic by the World Health Organization ("WHO") on March 11, 2020.

25.     On March 13, 2020, President Donald Trump issued the Coronavirus Disease 2019 (COVID-19) Emergency Declaration, which declared that the pandemic was of "sufficient severity and magnitude to warrant an emergency declaration for all states, territories and the District of Columbia."

26.     The Federal Government expressly recognized that with the COVID-19 emergency, "many small businesses nationwide are experiencing economic hardship as a direct result of the Federal, State and local public health measures that are being taken to minimize the public's exposure to the virus." [2]

---

[2]     *See Business Loan Program Temporary Changes; Paycheck Protection Program,* 13 CFR Part 120, Interim Final Rule ("SBA PPP Final Rule").

27.     The economic fallout from COVID-19, and the national response to it, was immediate and enormous.  As "stay at home" issues were ordered by states across the nation, countless businesses were forced by law to overhaul their business models, scale back their business dramatically, or shutter–either temporarily or permanently.  Business were further harmed as the public began to avoid all public spaces.  Furloughs and layoffs were rampant in the private sector.

28.     On March 25, 2020, in response to the economic damage caused by the COVID-19 crisis and to overwhelming public pressure, the U.S. Senate passed the Coronavirus Aid, Relief, and Economic Security Act, or the CARES Act.  The CARES Act was passed by the House of Representatives the following day and signed into law by President Trump on March 27, 2020.  Amounting to approximately $2 trillion, the CARES Act was the single-largest economic stimulus bill in American history.

29.     Critically, the CARES Act created a $659 billion loan program for business with fewer than five hundred employees, called the "Paycheck Protection Program" ("PPP")[3]. The goal of the PPP was to provide American small businesses with eight weeks of cash-flow assistance, with a certain percentage forgivable if utilized to retain employees and fund payrolls.  The loans are fully federally guaranteed and administered by the Small Business Administration ("SBA").[4]

30.     Basically, PPP loans operate more like grants if the recipient follows certain rules, including that at least 75 percent of the loan goes toward payroll.[5]  Businesses that follow the rules are permitted to submit a request to their SBA lender for total forgiveness.  Otherwise, the loan matures in two years and carries a one percent interest rate.[6]

---

[3]     The first phase of the PPP was for $349 billion, and when that quickly ran out, a second phase was funded for $310 billion.
[4]     Small Bus. Admin., Docket No. SBA-2020-0015, 13 CFR Part 120, Paycheck Protection Program 3245-AH34, Interim Final Rule, 85 Fed. Reg. 20814 § (2)(o) (Apr. 15, 2020).
[5]     85 Fed. Reg. 20812 § (2)(e); *id.* at 20813 § (2)(o).
[6]     *Id.* at 20813 § (2)(j).

COMPLAINT AND DEMAND FOR JURY TRIAL

31.     The SBA was charged with creating the PPP implementing regulations.  It issued the first interim final rule ("Initial Rule") on April 2, 2020, allowing businesses to begin applying for PPP loans with all SBA lenders on April 3, 2020.

32.     An important piece of the PPP was that applications were to be processed and funded on a "first-come, first-served" basis—that is, the SBA was to process applications and distribute funds based on the order in which they were received.  This made the SBA's list of approved lenders key gatekeepers in this process, which the lenders certainly understood.  Because the PPP was to be administered only through SBA-approved lenders, and because applicants were applying for funds from the single pot allocated for the program, submitting an accurate application for a loan through the SBA-approved lender as quickly as possible was critical.

33.     Congress added an incentive for the SBA-affiliated lenders, knowing they would face a crush of PPP loan applications:  for each loan processed and approved, the bank would receive an origination fee of five percent for loans up to $350,000; three percent for loans between $350,000 and $2 million; and one percent for loans between $2 million and $10 million.[7]

34.     With similar incentives in mind, Congress and the SBA also carved out a specific benefit for the countless accountants, attorneys, and advisors who would need to lead or assist their clients in preparing and filing PPP loan applications.  These individuals and entities are referred to as "agents" in the CARES Act and PPP implementing regulations.

35.     As explained in an Information Sheet provided for "lenders," the SBA states that '[a]n 'Agent' is an authorized representative and can be: an attorney; an accountant; a consultant; someone who prepares an applicant's application for financial assistance and is employed and compensated by the applicant; someone who assists a lender with originating, disbursing, servicing, liquidating, or litigating

---

[7]     *Id.*

COMPLAINT AND DEMAND FOR JURY TRIAL

SBA loans; a loan broker; or any other individual or entity representing an applicant by conducting

business with the SBA."[8]

36.     In addition, the SBA Regulations provide that "Agent fees **will** be paid out of lender fees.

The lender **will** pay the agent.  **Agents may not collect any fees from the applicant**.  The total amount

that an agent may collect from the lender for assistance in preparing an application for a PPP" loan is as

follows ("Agent Fees"): one percent (1%) for loans up to $350,000; 0.50% for loans between $350,000

and $2 million; and 0.25% for loans between $2 million and $10 million.[9]

37.     Within this context, Congress and the SBA set up a straightforward system for the

disbursement of PPP loan funds where the applicant is assisted by an agent: (i) the agent prepares the

application and/or necessary supporting documents for the client's application; (ii) the client applies for

the PPP loan through the lender; (iii) the lender submits the application to the SBA; (iv) the SBA

approves the loan and sends the client the money, through the lender, and eventually pays the lender's

origination fee; and (v) the agent submits the request for fee payment to the lender with the agent's fee

based upon (a) the work performed for the client and (b) the caps on agent fees provided by the SBA's

PPP regulations.

38.     Congress and the SBA did not set up a process or requirements to be followed by either

the lender or the agent for the agent to qualify to receive the agency portion of the fee.  That would have

had devastating consequences to the ability of the program to fulfill its mission to small business owners

and their consumer employees.  Based on information and belief, consistent with the understanding that

there was not any particular process required of agents to get paid, Defendants did not include a request

---

[8]     U.S. Dep't of Treasury, *Paycheck Protection Program (PPP) Information Sheet Lenders,*
https://home.treasury.gov/system/files/136PPP%20%20Lender%20Information%20Fact%20Sheet.pdf (last accessed May 25, 2020).
[9]     85 Fed. Reg. 20816 § (4)(c).

COMPLAINT AND DEMAND FOR JURY TRIAL

for agent information in the application process or provide any systematic mechanism or process for the borrower to list that an agent had assisted them in the preparation of the application.

39.     Unfortunately, Defendants are refusing to pay the fees of agents for their assistance in providing an accurate and truthful application for funding.

40.     Upon information and belief, this refusal is a company-wide policy.  Further, the fact that Defendants set up the application process without even asking the borrower if they utilized the assistance of an agent, suggests that the Defendants did not want to have any record of the agent information in their files.

41.     This policy of refusal to pay to agents "Agent Fees" that are due, and that *only* the lenders are authorized to pay, stands as an immediate threat to these agents' abilities to receive payment.  In the midst of an unprecedented economic/pandemic crisis, this policy represents short-sighted profit-padding at best, and blatantly illegal conduct, at worst.

42.     This policy stands in stark contrast to Defendants' promise on their website, that "[i]f an agent assists the borrower, the lender will compensate the agent out of the fee it receives from the SBA, at a rate of 0.25%-1% of the loan amount, depending on its size."[10]

43.     That is not the case.  Defendants are wholly refusing to pay the fees of agents who have timely contacted them requesting to be reimbursed, or requesting information on how to seek reimbursement.

44.     Refusing to pay Agent Fees is also inconsistent with agreements Defendants made in order to become approved PPP lenders.  Specifically, based on information and belief, Defendants were

---

[10]     J.P. Morgan Private Bank, *Small Business Owners:  CARES Act FAQ* (May 14, 2020), https://privatebank.jpmorgan.com/gl/en/insights/planning/small-business-owners-cares-act-faq (last visited May 26, 2020).

COMPLAINT AND DEMAND FOR JURY TRIAL

required to fill out and sign the "CARES Act Section 1102 Lender Agreement" for each loan. [11]  This submission requires each putative PPP lender to certify, under penalty of perjury, that it (i) "is in compliance and will maintain compliance with all applicable requirements of the [PPP], and PPP Loan Program Requirements[,]" (ii) will "service and liquidate all covered loans made under the Paycheck Protection Program in accordance with PPP Loan Requirements[,] and (iii) will "close and disburse each covered loan in accordance with the terms and conditions of the PPP Authorization and PPP Loan Requirements."

45.     To the extent Defendants had to certify, at any point, that they would follow the PPP's regulations in making PPP loans, they were not being truthful.  Defendants' policy to refuse to pay Agent Fees directly violates the PPP's implementing regulations.

46.     It is pursuant to these representations that Chase Bank has been allowed to process well over 200,000 PPP loan applications since the beginning of April 2020, securing approximately $29 billion in funding for loan recipients.  Defendants' average loan was approximately $121,339.  Even at an average 4% compensation for these loans, Chase Bank has or will receive eligible to receive over $1 billion in origination fees, from which they were required to pay agents approximately $200 million.

47.     Knowing that they were required to pay agents a percentage of PPP loan origination fees if an agent assisted an applicant in preparing and submitting the application, Defendants elected not to ask borrowers whether they utilized an "agent" to assist them in the application process and have not paid Plaintiff or similarly situated agents compensation from funded PPP loans.

---

[11]     U.S. Small Bus. Admin., CARES Act Section 1102 Lender Agreement, https://www.sba.gov/sites/default/files/2020-04/PP--Agreement-for-New-Lenders-Banks-Credit-Unions-FCS-w-seal-fillable.pdf (last accessed May 25, 2020).

COMPLAINT AND DEMAND FOR JURY TRIAL

### PLAINTIFF JAMES QUINN d/b/a Q FINANCIAL SERVICES' EXPERIENCE

48.     Plaintiff Q Financial Services is licensed CPA firm, located in Marco Island, Florida, which has provided financial consulting services to clients in the New York area for over thirty (30) years.

49.     Plaintiff James Quinn, the Owner of Q Consulting Services, came out retirement to assist former and referred clients who were in desperate need of the PPP loan program funds.  Q Consulting was asked to provide substantial assistance in the preparation and filing of PPP loan applications with Chase Bank for five New York small business clients.  These applications were critical to the survival of the clients' businesses.  The funding received for all five clients collectively was $1,525,494.

50.     Based on the SBA Regulations, Plaintiff Q Financial understood that it was not allowed to charge clients a fee relating to the application process.  The agents were only allowed to receive compensation from the agents' share of the estimated $20 billion in fees that the Federal Government paid the Lenders for originating the PPP loans.

51.     For its clients, Plaintiff Q Financial had the primary role in calculating the payroll information needed for the application, and providing the clients' accounting information, advice, documentation in support of the PPP loan application.  Mr. Quinn personally assisted each client and, due to his twenty-year experience as a financial advisor and transactional treasurer assisting middle market companies in acquiring financing, he prepared the application and financing package in such a way to allow Chase Bank to easily verify the necessary company financial data, thereby expediting the clients' loans.  Plaintiff Q also signed the clients' PPP loan applications as the "authorized representative" of all five clients and indicated "Financial Advisor/CPA" on the title line.  Additionally, the financial packages submitted with each clients' PPP loan application to Chase Bank was on

COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff's letterhead.  Plaintiff Q Financial also submitted an agency letter with each application submitted to Chase Bank.

52.     Plaintiff Q Financial will also have ongoing responsibility for advising clients on the forgiveness of the PPP loan.

53.     As of May 22, 2020, Plaintiff QFinancial's loan amount and fee analysis is as follows:

| Borrower | Loan Awarded | Chase Fee | Chase % | Q Financial Agency Fee | Q Financial % |
|---|---|---|---|---|---|
| No. 1 | $1,329,515 | $33,237.88 | 2.5 | $6,647.58 | 0.5 |
| No. 2 | $102,472 | $5,123.60 | 5 | $1,024.72 | 1.0 |
| No. 3 | $53,542 | $2,677.10 | 5 | $535.42 | 1.0 |
| No. 4 | $13,610 | $680.00 | 5 | $136.10 | 1.0 |
| No. 5 | $26,355 | $1,317.75 | 5 | $263.55 | 1.0 |
| **TOTAL** | **$1,525,494** | **$43,036.33** | **2.82%** | **$8,607.37** | **0.56%** |

54.     Pursuant to PPP regulations, Defendants would be entitled to receive $43,036.33 from the SBA in origination fees, of which one-fifth (*i.e.,* one percent of the total loan) would have to be paid to Plaintiff Q Financial for its work as an agent on the PPP loan applications.  Thus, Plaintiff Q Financial was –and remains—owed $8,607.37 for its work.

55.     Plaintiff Mr. Quinn was thrilled that its clients received their loans from the SBA. Thereafter, he demanded payment of its agency fees from Defendants because SBA regulations prohibited Plaintiff from collecting from its clients.

56.     Accordingly, Plaintiff Mr. Quinn reached out to Ivan Santos, Vice President of Business Relationship Manager, Chase Bank, White Plains, New York,  and Paul Harrison, Vice President of Architecture at Chase Bank, both of whom are the Chase Bank relationship managers for his clients'

COMPLAINT AND DEMAND FOR JURY TRIAL

PPP applications, about how to obtain its agent fees.  However, he was told by Paul Harrison that "Chase Bank does not pay fees."  After requesting to speak to Mr. Harrison's supervisors, Mr. Quinn was ignored and continues to be ignored.

57.     Therefore, Plaintiff Mr. Quinn sent a letter addressed to Ms. Jennifer Roberts, CEO of Chase Business Banking, 383 Madison Avenue, New York City, New York, dated May 22, 2020. Within this letter, Mr. Quinn quoted the pertinent provisions of the CARES Act which entitles agents like him to compensation, as well as the SBA fee schedule, and attached those excerpts to his letter. Plaintiff Mr. Quinn also highlighted the fact that "agent letters" were provided to Chase Bank and emphasized that it was documented through the agent letter, the applications, and the financial packages, the Q Financial was executing the PPP loan applications as the financial advisor/CPA to each client.   To date, Plaintiff Q Financial has not received a follow-up response from Chase Bank.

58.     Thus, Defendants have enacted a company-wide policy—and discussed it on a call from a Vice President to Plaintiff Mr. Quinn, that "Chase does not pay fees" and therefore are entitled to nothing and will receive nothing.

59.     To date, Plaintiff Q Financial has not received a penny for its substantial work on its clients' PPP loan applications.  And if it is up to Defendants, it never will.  All of the potential routes for payment –its clients, Defendants, PPP funds, SBA—have been closed off.

## PLAINTIFF FAHMIA, INC.'S EXPERIENCE

60.     Plaintiff Fahmia, Inc. is a California CPA firm which has provided financial services to clients in the Southern California Area for over 30 years, including bookkeeping, taxation, payroll services, financial planning and consulting for small businesses and individuals.  In March, Plaintiff became aware that the CARES Act had been signed into law.  Plaintiff, knowing that the COVID-19

crisis would significantly impact clients' businesses, sought to obtain PPP loans through various SBA-approved lenders on behalf of clients.

61.     Plaintiff Fahmia's professionals spent considerable time familiarizing themselves with the Act and the related SBA Regulations, in particular, (a) Section 1102, which permits the SBA to guarantee 100% of Section 7(a) loans under the PPP and (b) Section 1106 of the Act, which provides forgiveness of up to the full principal amount of qualifying loans guaranteed under the PPP.

62.     In or about March, April, and May, 2020, Plaintiff Fahmia assisted many clients in the gathering and analysis of their documents, as well as the calculations and preparation of the loan applications.

63.     Based on the SBA Regulations, Plaintiff Fahmia understood that it was not allowed to charge clients a fee relating to the application process.  The agents were only allowed to receive compensation from the agents' share of the estimated $20 billion in fees that the Federal Government paid the Lenders for originating the PPP loans.

64.     For its clients, Plaintiff Fahmia had the primary role in calculating the payroll information needed for the application, and providing the clients' accounting information, advice, documentation in support of the PPP loan application. Plaintiff Fahmia will have ongoing responsibility for advising clients on the forgiveness of the PPP loan.

65.     Plaintiff Fahmia provided all of these services to two clients who obtained a PPP loans from Chase Bank in the combined amount of $118,156.  Based on information and belief, Chase Bank was paid or will be paid, an origination fee of $5,907.80, of which Plaintiff Fahmia is entitled to $1,1181.56 (1% of total loan amount) of that fee for its work as the agent of the borrowers in submitting the application and documentation.

COMPLAINT AND DEMAND FOR JURY TRIAL

66.     Defendants did not comply with the SBA Regulations because they have not paid Plaintiff the agent fees to which it is entitled despite awarding PPP loans to Plaintiff Fahmia's clients for whom Plaintiff Fahmia acted as a PPP agent.  Instead, Defendants retained all of the Agent Fees for themselves.

67.     As a result of Defendants' unlawful and unfair actions, Plaintiff Fahmia and the Class have suffered financial harm by being deprived of the statutorily mandated compensation for the professional services provided to clients in assisting them with obtaining PPP loans.

## PLAINTIFF PRINZO & ASSOCIATES' EXPERIENCE

68.     Plaintiff Prinzo & Associates is a Pennsylvania CPA firm which has provided financial services to clients in sixteen different states and four different countries since 1991, including bookkeeping, taxation, payroll services, financial planning and consulting for small businesses and individuals.  In March, Plaintiff Prinzo became aware that the CARES Act had been signed into law. Plaintiff Prinzo, knowing that the COVID-19 crisis would significantly impact clients' businesses, sought to obtain PPP loans through various SBA-approved lenders on behalf of clients.

69.     Plaintiff Prinzo's professionals spent considerable time familiarizing themselves with the Act and the related SBA Regulations, in particular, (a) Section 1102, which permits the SBA to guarantee 100% of Section 7(a) loans under the PPP and (b) Section 1106 of the Act, which provides forgiveness of up to the full principal amount of qualifying loans guaranteed under the PPP.

70.     In or about March, April, and May, 2020, Plaintiff Prinzo assisted many clients in the gathering and analysis of their documents, as well as the calculations and preparation of the loan applications.

71.     Based on the SBA Regulations, Plaintiff Prinzo understood that it was not allowed to charge clients a fee relating to the application process.  The agents were only allowed to receive

COMPLAINT AND DEMAND FOR JURY TRIAL

compensation from the agents' share of the estimated $20 billion in fees that the Federal Government paid the Lenders for originating the PPP loans.

72.     For its clients, Plaintiff Prinzo had the primary role in calculating the payroll information needed for the application, and providing the clients' accounting information, advice, documentation in support of the PPP loan application. Plaintiff Prinzo will have ongoing responsibility for advising clients on the forgiveness of the PPP loan.

73.     Plaintiff Prinzo provided those services to one client who obtained a PPP loan from Chase Bank in the amount of $45,097.  Based on information and belief, Chase Bank was paid or will be paid, an origination fee of $2,254.85, of which Plaintiff Prinzo is entitled to $450.97 (1% of total loan amount) of that fee for its work as the agent of the borrower in submitting the application and documentation.

74.     Defendants did not comply with the SBA Regulations because they have not paid Plaintiff Prinzo the agent fees to which it is entitled despite awarding PPP loans to Plaintiff Prinzo's clients for whom Plaintiff Prinzo acted as a PPP agent.  Instead, Defendants retained all of the Agent Fees for themselves.

75.     As a result of Defendants' unlawful and unfair actions, Plaintiff Prinzo and the Class have suffered financial harm by being deprived of the statutorily mandated compensation for the professional services provided to clients in assisting them with obtaining PPP loans.

## CLASS ALLEGATIONS

76.     Plaintiffs brings this action on behalf of itself and all others similarly situated as a nationwide Class, defined as follows:

> All persons and businesses who served as an agent in relation to, and provided assistance to a client in relation to, the preparation and/or submission of a client's PPP loan application to Chase Bank which resulted in a loan being funded under

COMPLAINT AND DEMAND FOR JURY TRIAL

the PPP. Plaintiff further brings this action on behalf of a subclass of individuals defined as follows:

**New York Subclass.**  All persons and businesses in New York who served as an agent in relation to, and provided assistance to a client in relation to, the preparation and/or submission of a client's PPP loan application to Chase Bank which resulted in a loan being funded under the PPP.

77.     Excluded from this Class and Subclass (hereinafter "the Class" unless otherwise indicated) are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors,  and any entity in which Defendants or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits of otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

78.     Plaintiffs reserve the right to expand, limit, modify, or amend this Class definition, including the addition of one or more subclasses, in connection with Plaintiffs' motion for class certification, or any other time, based upon new facts obtained during discovery.

79.     *Numerosity:*  The Class is composed of hundreds of Agents ("Class Members") whose joinder in this action would be impracticable.  The disposition of their claims through this class action will benefit all Class Members, the parties, and the courts.

80.     *Commonality and Predominance:*  There is a commonality in questions of law and fact affecting the Class.  These questions of law and fact predominate over individual questions affecting individual Class Members, including, but not limited to, the following:

> a.   Whether Defendants' conduct violates the CARES Act and/or its implementing regulations;

COMPLAINT AND DEMAND FOR JURY TRIAL

b.   Whether Defendants are required to compensate Plaintiffs out of the origination fees obtained from SBA through the PPP;

c.   Whether Plaintiffs are entitled to compensation by Defendants for its work assisting in its client's PPP loan application;

d.   Whether Defendants' conduct was willful and knowing;

e.   Whether Defendants submission of completed Form 2484 constituted an agreement;

f.   Whether Defendants breached that agreement;

g.   Whether Defendants' conduct was pursuant to a company-wide policy or policies;

h.   Whether Defendants' conduct violates Gen. Bus. Law § 349(a);  and

i.    Whether Defendants' conduct constitutes unjust enrichment.

81.     *Superiority:*  This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy given that joinder of all parties is impracticable.  The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions.  Thus, it would be difficult and not economical for the individual members of the Class to obtain effective relief from Defendants' misconduct.  Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Compliant.  By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.  Economies of time, effort and expense will be fostered and uniformity of decisions ensured.

82.     *Typicality:*  Plaintiffs' claims are typical of, and are not antagonistic to, the claims of all Class Members, in that Plaintiffs and members of the Class sustained damages arising out of Defendants' uniform wrongful conduct.

83.     *Adequacy:*  Plaintiffs will fairly and adequately represent and protect the interests of the Class and has retained counsel with substantial experience in litigating complex cases, including consumer fraud and class actions.  Plaintiffs' claims are representative of the claims of the other members of the Class.  That is, Plaintiffs and members of the Class sustained damages as a result of Defendants' uniform conduct.  Plaintiffs also have no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiffs.  Both Plaintiffs and their counsel will vigorously prosecute this action on behalf of the Class and have the financial ability to do so.  Neither Plaintiffs nor counsel have any interest adverse to other Class Members.

84.     *Ascertainability:*  Plaintiffs are informed and believe that Defendants keep extensive computerized records of their loan applications through, *inter alia,* computerized loan application systems and federally-mandated record-keeping practices.  Defendants have one or more databases through which all of the borrowers may be identified and ascertained, and it maintains contact information, including electronic mail and mailing address.  From this information, the existence of the Class Members (i.e., borrowers' Agents) can be determined, and thereafter, a notice of this action can be disseminated in accordance with due process requirements.

85.     Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## CAUSES OF ACTION

## COUNT I – DECLARATORY RELIEF

86.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

87.     Plaintiffs and the Class represent individuals who are "agents" as defined by the SBA regulations for the PPP.

88.     Plaintiffs and the putative Class have assisted clients with the process of preparing applications, and applying for, PPP loan funds.  Defendants, despite the clear command of the SBA's PPP regulations, have refused to make these payments.  An actual controversy has arisen between Plaintiff and the Class, on one hand, and Defendants on the other, wherein Defendants deny by their refusal to pay that they are obligated to pay Plaintiffs' and the Class's "agent" fees pursuant to PPP regulations.

89.     Plaintiffs and the Class seek a declaration, in accordance with SBA regulations and pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that Defendants are obligated to set aside money to pay, and pay third-party agents –within the SBA-approved limits—for the work performed on behalf of a client in relation to the preparation and/or submission of a PPP loan application that resulted in a funded PPP loan.

## COUNT II – BREACH OF CONTRACT, THIRD PARTY BENEFICIARY

90.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

91.     Based on information and belief, Defendants entered into an agreement with the SBA in connection with the loans funded in the PPP.

COMPLAINT AND DEMAND FOR JURY TRIAL

92.     The agreements required that Defendants would adhere to all PPP rules and regulations and incorporate these requirements by reference.  Defendants and the SBA understood that agents involved in the preparation and submission of PPP loan applications would need to be compensated.

93.     The SBA's PPP regulations specifically require that PPP lenders pay the fees of any "agent" that assists with the PPP loan application process, within limits.

94.     Defendants understood that Plaintiffs and the Class were intended beneficiaries in this agreement.  Nevertheless, Defendants have refused to live up to their end of the bargain, and have uniformly refused to pay agent fees to Plaintiffs and the Class.

95.     By refusing to pay agent fees in accordance with SBA regulations, Defendants are violating the terms of their agreement, thereby damaging Plaintiffs and the Class.  Plaintiffs and the Class thus ask this Court to award them damages sufficient to make them whole, and compensate them for work they did in preparing clients' PPP loan application for loans that were funded, consequential damages, and all other damages available at law.

## COUNT III – VIOLATIONS OF NEW YORK GBL § 349

96.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

97.     Plaintiffs and the Class are "persons" within the meaning of Gen. Bus. Law § 349(h).

98.     Gen. Bus. Law § 349(a) states: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

99.     As alleged herein, Defendants engaged in deceptive acts and practices in the form of misrepresentations on their website, that "[i]f an agent assists the borrower, the lender will compensate the agent out of the fee it receives from the SBA, at a rate of 0.25%-1% of the loan amount, depending

COMPLAINT AND DEMAND FOR JURY TRIAL

on its size."[12]  However, upon request of payment by Plaintiffs and the members of the Class, Chase

Bank expressed its system-wide refusal to pay any agent fees owed as a result of agents' work in

assisting clients in obtaining their PPP loans.  Such misrepresentations and omissions during the conduct

of business in and from New York violates Gen. Bus. Law § 349(a).

100.    Defendants knew or should have known that their acts, practices, statements, policies,

correspondence and representations, as discussed above, were false and likely to deceive and mislead

Plaintiff and the Class members.

101.    Plaintiffs and the Class members have been injured as a result of Defendants' violations

of Gen. Bus. Law § 349(a), as they have been deprived to agent fees to which they are entitled.

102.    Defendants' deceptive and misleading acts and practices have directly, foreseeably, and

proximately caused damages and injury to Plaintiffs and the other members of the Class and has had a

broader impact on consumers and the public at large. The agency fees to which Plaintiffs and the Class

are entitled are paid directly from the income taxes of New Yorkers, and the public at large.  Thus, the

refusal of Chase Bank to pay agent fees for their assistance in obtaining PPP loans in accordance with

SBA regulations for their clients during an economic crisis is a matter of public interest of tax-payers.

Specifically, the public had an expectation that the PPP funds were allocated for the assistance of

struggling small businesses, including Plaintiffs and the Class, but instead, Chase Bank has been

unjustly enriched at the expense of agents by Chase Bank's failure to pay the agents their mandated

agent fees.

103.    Thus, Plaintiffs and the Class are entitled to pursue claims against Defendants pursuant to

Gen. Bus. Law § 349 (h) to redress Defendants' violations of Gen. Bus. Law § 349(a).

---

[12]     J.P. Morgan Private Bank, *Small Business Owners:  CARES Act FAQ* (May 14, 2020),
https://privatebank.jpmorgan.com/gl/en/insights/planning/small-business-owners-cares-act-faq (last visited May 26, 2020).

COMPLAINT AND DEMAND FOR JURY TRIAL

104.     Plaintiffs and the Class thus ask this Court to award them equitable relief, restitution, civil penalties, punitive damages, attorney fees, consequential damages, and all other damages available at law.

## COUNT IV – UNJUST ENRICHMENT

105.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

106.     Unjust enrichment, or restitution, may be alleged where a Defendant unjustly obtains and retains a benefit to the Plaintiffs' detriment, where such retention violates fundamental principles of equity, justice, and good conscience.

107.     Here, Defendants have obtained millions of dollars in benefits in the form of PPP loan origination fees.  A portion of those fees were to be paid to agents, like and including Plaintiffs, who assisted in their clients' PPP loan applications.  But Defendants are refusing to pay those fees, in contravention of PPP regulations.

108.     Principles of justice, equity, and good conscience demand that Defendants not be allowed to retain these agent fees.  Defendants have fallen short in their duties as lenders, and during a crisis no less.  As a result, Plaintiffs and the putative Class have been unable to obtain the agent fees due to them.

109.     Accordingly, Defendants must disgorge the portion of any and all PPP origination fees that they have retained to the extent they are due to Plaintiffs and the putative Class in their capacities as agents.

## COUNT V – CONVERSION

110.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

111.     Under the SBA regulations, Plaintiffs and the Class, as PPP agents, have a right to agent fees that must be paid from the amount of lender fees provided to Defendants for processing the funded PPP loan applications of Plaintiffs' client and the Class's clients.

112.     The SBA regulations state that "[a]gent fees *will* be paid out of lender fees" and provide guidelines on the amount of agent fees that should be paid to the PPP agent, based upon the size of the PPP loan.

113.     Additionally, the SBA regulations require that lenders, not loan recipients, pay the agent fees.  The SBA regulations unequivocally state that "[a]gents may not collect fees from the applicant."

114.     Plaintiffs and the Class assisted clients with applying for PPP loans, including gathering and curating information necessary for completing PPP loan applications that were subsequently funded. Due to Plaintiffs' and the Class's efforts, their clients were awarded PPP loans, through applications made with Defendants.  As such, Plaintiffs have a right to immediate possession of the agent fees.

115.     Although Plaintiffs are entitled to agent fees under the SBA regulations, Defendants have refused to provide those fees to Plaintiffs and the class, thus keeping the agent fees that were paid to it for purposes of being passed on to the agents.  By withholding these fees, Defendants have maintained wrongful control over Plaintiffs' property inconsistent with Plaintiffs' entitlements under the SBA regulations.

116.     Defendants committed civil conversion by retaining monies owed to Plaintiffs and Class members.

117.     Plaintiffs and the Class have been injured as a direct and proximate cause of Defendants' misconduct.  Plaintiffs, as such, seek recovery from Defendants in the amount of the owed agent fees, and all other relief afforded under the law.

COMPLAINT AND DEMAND FOR JURY TRIAL

## DEMAND FOR JURY TRIAL

118.    Plaintiffs demand a trial by jury on all issues to the fullest extent permitted under applicable law

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Q Financial Services, Fahmia, Inc. and Prinzo & Associates, individually and on behalf of the Class, respectfully pray for the following relief:

(a) An order certifying the Class as defined above, appointing Plaintiffs as the representatives of the Class, and appointing their counsel as Class Counsel;

(b) An order declaring that Defendants' actions, as set out above, constitute unjust enrichment, conversion, breach of contract on behalf of third-party beneficiary, and violate Gen. Bus. Law § 349(a), and violate the SBA's PPP regulations;

(c) An award of all economic, monetary, actual, consequential, compensatory, and punitive damages available under the law and caused by Defendants' conduct, including without limitation, actual damages for past, present and future expenses caused by Defendants' misconduct, lost time and interest, and all other damages suffered, including any damages likely to be incurred by Plaintiff and the Class;

(d) An award of reasonable litigation expenses and attorneys' fees;

(e) An award of pre- and post-judgment interest, to the extent allowable;

(f) The entry of an injunction and/or declaratory relief as necessary to protect the interests of the Plaintiffs and the Class; and

(g) Such other further relief that the Court deems reasonable and just.

Dated:  May 28, 2020                     Respectfully submitted,

                                         MCCUNE WRIGHT AREVALO LLP

                              By:  /s/ Elaine S. Kusel
                                         Elaine S. Kusel
                                         Michele M. Vercoski
                                         Richard D. McCune
                                         Tuan Q. Nguyen
                                         MCCUNE WRIGHT AREVALO LLP
                                         18565 Jamboree Road, Suite 550
                                         Irvine, California 92612
                                         Telephone: (909) 557-1250
                                         Facsimile: (909) 557-1275
                                         Email:   esk@mccunewright.com
                                                  mmv@mccunewright.com
                                                  rdm@mccunewright.com
                                                  tqn@mccunewright.com

                                         *Attorney for Plaintiffs and Putative Class*

COMPLAINT AND DEMAND FOR JURY TRIAL

## JURY DEMAND

Plaintiffs, on behalf of themselves and the putative Class, demands a trial by jury on all issues so triable.

McCune Wright Arevalo LLP

By: _/s/ Elaine S. Kusel_
Elaine S. Kusel
Michele M. Vercoski
Richard D. McCune
Tuan Q. Nguyen
**McCune Wright Arevalo LLP**
18565 Jamboree Road, Suite 550
Irvine, California 92612
Telephone: (909) 557-1250
Facsimile: (909) 557-1275
Email:   esk@mccunewright.com
mmv@mccunewright.com
rdm@mccunewright.com
tqn@mccunewright.com

*Attorney for Plaintiffs and Putative Class*