# EXHIBIT H

# AUDIT REPORT

## SBA NEEDS TO IMPROVE ITS OVERSIGHT OF LOAN AGENTS



September 25, 2015                                    REPORT NUMBER 15-16



# EXECUTIVE SUMMARY

## SBA NEEDS TO IMPROVE ITS OVERSIGHT OF LOAN AGENTS

Audit Report
No 15-16

September 25, 2015

## What OIG Reviewed

This report presents the results of our audit of the Small Business Administration's (SBA) oversight of loan agents. Loan agents frequently play an important role within SBA lending programs, often facilitating access to capital by connecting borrowers in search of financial assistance with lenders offering SBA products or by providing other services. However, at times, these third-party relationships have resulted in SBA program loss and risk.

Our objectives were to determine the extent to which SBA has (1) identified financial and other impacts resulting from the involvement of loan agents in SBA loan programs and (2) developed controls to effectively track, evaluate, and enforce loan agent participation and performance.

## What OIG Found

Since 2005, SBA OIG has investigated at least 22 cases with confirmed loan agent fraud totaling at least $335 million. Further, our analysis determined that loan agents were involved in approximately 15 percent of all 7(a) loans and resulted in increased risk of default. Specifically, 7(a) loans made during 2011, which resulted in the lender paying a referral fee to a loan agent, defaulted at a rate 28 percent higher than loans where no referral fee was reported.

While SBA has strengthened controls over loan agent participation within its loan programs, further improvements in controls are necessary to ensure program integrity and mitigate the risk of fraud and loss.

Since December 1, 2010, SBA recorded over 51,000 7(a) loan agent compensation disclosures, representing a variety of services. However, we found the quality of SBA's loan agent data was poor and materially incomplete. Further, although previously recommended in 1998, SBA had not established effective controls over the tracking and monitoring of loan agent performance and therefore could not adequately assess potential risks or identify problem agents. In 2000, OIG identified loan agent tracking and enforcement as a management challenge. Finally, SBA had not established a method to track loan agents and their compensation on 504 loans.

Officials from SBA's Office of Credit Risk Management (OCRM), who are responsible for oversight and risk management of SBA credit programs, were developing plans to increase loan agent monitoring. The plans include provisions in a proposed OCRM support contract to conduct loan agent analysis—including a loan agent risk assessment plan in 2015—and adding significant loan agent activity as a risk area to its on-site review assessment system. While we commend OCRM's intent to increase oversight of loan agents, SBA's incomplete and inaccurate loan agent disclosure data at the loan level is likely to hinder oversight efforts.

## OIG Recommendations

We made nine recommendations that, if implemented, will improve SBA's internal controls and facilitate effective monitoring over loan agent participation and risk mitigation efforts.

## Agency Response

SBA agreed with our findings and recommendations. The Agency plans to implement procedures for the regular monitoring of SBA Form 159 data against performance metrics. Further, SBA intends to implement a process for reporting to Agency management and OIG, instances where the monitoring identifies concerning trends or suspected fraudulent activity.

Additionally, SBA plans to review and correct the existing Form 159 data and implement application controls to ensure the integrity of the Form 159 database.

# Introduction

The Small Business Administration (SBA) is authorized under the Small Business Act (Act) to provide financial assistance to small businesses in the form of Government-guaranteed loans.[1] Participating lenders enter into agreements with SBA to make loans to small businesses in accordance with SBA loan program requirements.  Lending institutions and loan applicants sometimes use agents to conduct business on their SBA loans.  These loan agents play an important role within SBA lending programs, often facilitating access to capital by connecting borrowers in search of financial assistance with lenders offering SBA products or by providing other services.  These agents can include attorneys, accountants, consultants, packagers, or lender service providers (LSP).[2]

The Act requires that SBA loan applicants identify any loan agents they utilize.  For most matters involving SBA assistance, the Agency requires that the loan agent and lender or applicant have a compensation agreement (Form 159) for services that loan agents have or will render to the applicant or lender.[3]  Each agreement discloses the services rendered, entity compensated, and amount charged.[4]  While the majority of loan agents receive compensation by providing a beneficial service to these parties, at times, these third-party relationships have resulted in fraud and SBA program losses.  Since 1994, there have been at least three significant cases of loan agent fraud that have resulted in Congressional interest and changes to SBA program controls.  These cases resulted in hundreds of millions of dollars of fraudulent SBA loans and significant losses to taxpayers.

SBA's focus on mitigating risks associated with the use of loan agents within its loan programs has varied over time as Agency leadership and priorities have changed.  In an October 1995 Congressional hearing for the House Committee on Small Business, there appeared to be consensus among Congressional leaders, SBA, OIG, and other industry professionals—including loan agents and lenders—that SBA needed to track and monitor loan agent activities to help detect and prevent fraud.  The results of this hearing concluded that the underlying problem with loan agent fraud was that there was no system in place to track loan agents.

SBA has a history of loan agent fraud within its 7(a) Guaranteed Loan Program, as well as prominent cases within its 504 Certified Development Company (CDC) and Disaster Loan Programs.  Over the last 20 years, the Agency has made incremental improvements in its ability to prevent loan agent fraud and monitor and track loan agent activities.  In fiscal year (FY) 2000, due in part to a pattern of fraud by loan agents in the 7(a) Program, SBA OIG called for effective tracking and enforcement of loan agents, identifying loan agent oversight as a management challenge that continues to this day.[5]  The Agency's progress in implementing a robust loan agent registration and monitoring system has been limited by what it has deemed its lack of statutory authority to collect certain personal information from loan agents that would uniquely identify them.  While the Agency's response to fraudulent loan agents goes as far back as 1994, SBA only began recording and tracking loan agent information in a searchable format in 2010.

---

[1] Title 15 U.S. Code Section 636
[2] SBA has proposed rule changes to include parties acting as a referral agent, including the term "broker," in the loan agent definition, as this reflects the lending industry standard terminology.
[3] In some cases, loan agents providing professional services, such as accountants or attorneys, may be excluded from this requirement.
[4] SBA Form 159, *Fee Disclosure Form and Compensation Agreement (SBA 7(a) Loan)*.
[5] Challenge 7 of the *OIG Report on the Most Serious Management and Performance Challenges Facing the Small Business Administration In Fiscal Year 2015* (October 2014).

## Prior Work

A 1998 OIG report on loan agents in the Section 7(a) Program noted that SBA could not determine the level of loan agent involvement, even though applicants and lenders were increasingly relying on loan agents.[6]  While the increased use of loan agents has helped small businesses gain access to capital, this report stated that poor lender oversight may create an environment susceptible to fraud.  Specifically, the report noted that criminal investigations had been initiated on 18 loan agents associated to $123 million of loans in the 7(a) Program alone.  This report included multiple recommendations for improving SBA oversight of loan agents, including establishing (1) a loan agent registration process and monitoring system and (2) benchmarks that, if exceeded, would trigger closer SBA examination of a loan agent's performance.  In its response, SBA officials at the time shared the concerns identified in the report and stated that they were in basic agreement with its recommendations.  However, these recommendations were not implemented due to concerns regarding the information that a registration system could collect, such as social security numbers.

A 2013 OIG report found that SBA lacked a process for monitoring and addressing risk in its loan portfolio.  To help SBA balance the need to make capital available to small businesses while mitigating risk for borrowers and taxpayers, OIG recommended that SBA: (1) implement a portfolio risk-management program that analyzes risk across portfolio segments, (2) use data from the portfolio risk-management program to support risk-based decisions in its loan programs, and (3) develop a process within the portfolio risk-management program to ensure additional controls are implemented to mitigate identified risks where necessary.[7]  In response to this report, SBA implemented a portfolio risk-management program and stated that it "will continue to conduct portfolio and program delivery analysis on an annual basis to identify additional program risk, specifically as related [to] loan agents and lender service providers."  While the Office of Credit Risk Management (OCRM) has implemented a portfolio risk-management program, two recommendations—to use data to support risk-based decisions and to develop a process to implement controls to mitigate risks—remain outstanding.

A 2015 OIG report found that SBA needed to improve its internal controls to ensure LSPs' performance and conduct comply with SBA requirements.  While SBA did have some controls in place to identify LSP involvement, it could not adequately determine LSP participation in SBA's programs or evaluate their performance.  To help SBA strengthen its controls and mitigate risks associated with LSP participation, OIG recommended that SBA (1) develop a method to identify LSP participation within SBA loan programs and their associated SBA loan portfolios to evaluate performance and (2) establish a formal process and procedures to address referrals related to LSPs.  In its response, SBA agreed with the recommendations and is in the process of implementing the recommendations.[8]

## Objectives

Our objectives were to determine the extent to which SBA has (1) identified financial and other impacts resulting from the involvement of loan agents in SBA loan programs and (2) developed controls to effectively track, evaluate, and enforce loan agent participation and performance.  OIG Report 15-06, *Improvement is needed in SBA's Oversight of Lender Service Providers*, was issued on

---

[6] SBA OIG, *Loan Agents and the Section 7(a) Program,* Report 98-03-01 (March 31, 1998).  This report later served as the basis for the SBA Management Challenge on loan agents.

[7] SBA OIG, *The SBA's Portfolio-Risk Management Program can be Strengthened,* Report 13-17 (July 2, 2013).

[8] SBA OIG, *Improvement is Needed is SBA's Oversight of Lender Service Providers*, Report 15-06 (March 12, 2015).

March 12, 2015 and solely dealt with the second objective.  This report is the second of two, and will address both objectives as they relate to SBA's oversight of loan agents, not to include LSPs.

**Loan Agent Activity and Impact to the 7(a) Program**

As part of our first objective, we focused on the 7(a) Program, where the majority of loan agent activity occurs.  The exact level of loan agent involvement in the 7(a) Program is unknown.  Agency officials estimated that third-party loan agents were involved in at least 10 percent of 7(a) loans.  However, we confirmed multiple instances where lenders did not report loan agent involvement to SBA, which are detailed in Finding 2.  We conducted an analysis of the existing Form 159 data and determined that loan agent participation was approximately 15 percent of all 7(a) loans.  Further, a recent industry survey noted that 28 of the 70 responding lenders generated at least 25 percent of their SBA 7(a) loan volume from loan brokers.[9]  We determined that 14 of the top 30 SBA 7(a) lenders either advertised the use of loan agents or reported significant loan agent activity.[10]  We also interviewed eight lenders during this audit.  Of the eight lenders that we interviewed, six stated that they viewed loan agents as critical business partners, while seven noted that there were risks associated in dealing with loan agents.  The majority of the lenders noted that they would support improved SBA controls such as a loan agent registration system or additional oversight of loan agent activity.

When implementing its loan agent tracking database in 2010, SBA noted that "many lenders utilize loan agents as a means of generating SBA loans" and that it "believes it is prudent to ascertain whether the performance of loans generated by loan agents is different from that of loans generated through a lender's internal lending channels."[11]  While performance data is still limited at this time, our analysis determined that 7(a) loans made during 2011, which resulted in the lender paying a referral fee to a loan agent, defaulted at a rate 28 percent higher than loans where no referral fee was reported.

As previously noted, multiple cases of loan agent fraud have occurred within SBA loan programs, drawing Congressional interest and changes to SBA program controls.  These cases have resulted in hundreds of millions of dollars of fraudulent SBA loans and significant losses to taxpayers.  Further, these cases have often involved change of ownership transactions, which our office has communicated are a higher risk to the Agency.[12, 13]

Since 2005, SBA OIG has investigated at least 22 cases with confirmed loan agent fraud involving 602 SBA loans and totaling at least $327 million in the 7(a) Program and another $8 million in the 504 Loan Program.[14]  Table 1 below provides examples of some of the more significant cases of loan agent fraud in the 7(a) Program.  OIG is actively engaged in other ongoing cases of potential loan agent fraud.

---

[9] Coleman Report, *7(a) Loan Broker Survey Results* (June 2015). http://colemanreport.com/sba-7a-lender-loan-broker-survey-results.
[10] Based on the number of approved loans from October 1, 2012 through June 30, 2014.
[11] SBA, *Loan Agent Data Submission for 7(a) Loans*, Procedural Notice 5000-1177 (October 1, 2010).
[12] SBA, *Detecting Fraud in Small Business Administration Lending Programs*, Informational Notice 9000-1793 (April 7, 2009).
[13] SBA OIG, *The OIG High Risk 7(a) Loan Review Program Recommends $1.8 Million in Recoveries*, Report 15-09 (March 20, 2015).
[14] See Appendix II, which provides detailed summaries describing the nature and impact of three unique SBA loan agent fraud cases.

**Table 1.  Significant 7(a) Loan Agent Fraud Cases Since 2005**

| | Number of Loans | Amount of Loans (Approx.) | Number of Lenders Impacted | Number of Loan Agents |
|---|---|---|---|---|
| **Case Example 1** | 174 | $13,000,000 | 20 | 2 |
| **Case Example 2** | 129 | $90,000,000 | 19 | 2 |
| **Case Example 3** | 58 | $41,000,000 | 12 | 1 |
| **Case Example 4** | 44 | $51,000,000 | 4 | 1 |
| **Case Example 5** | 41 | $38,000,000 | 1 | 5 |
| **Case Example 6** | 31 | $23,000,000 | 1 | 8 |

Source: OIG Investigative Management Information System (IMIS)

Although we acknowledge that the amount of confirmed fraud related to loan agents is small when compared to the billions of dollars in overall SBA lending volume during this period, we believe the level of fraud perpetuated by loan agents in SBA loan programs is much higher than the numbers presented in this report.

In order to benchmark SBA's current controls to mitigate this risk, we interviewed five other Federal agencies, or their OIGs, with similar loan programs.  The agencies reiterated the important role that loan agents have in the lending industry, as well as the fraud and performance risks that loan agents introduce to Federal-guaranteed loan programs.  Specifically, four of the five agencies that we interviewed provided instances of where loan agent fraud had occurred in their loan programs.  We also noted that the OIGs for two of these agencies had recently prosecuted multiple cases of significant loan agent fraud.  Additionally, the Department of Agriculture's (USDA) Inspector General testified in 2009 regarding its concerns about loan agent participation, stating that lenders originating loans with the assistance of loan brokers to USDA were submitting substandard packages for review.[15]  The Inspector General also noted that lenders may be less willing to dedicate resources to loans that will be eventually sold—and might therefore not practice the same due diligence on brokered loans.

---

[15] United States. Cong. House. Committee on Agriculture. *Hearing to Review Rural Development Programs Operated by the U.S. Department of Agriculture and Status of American Recovery and Reinvestment Act Funds for These Programs.* June, 2009. 111th Cong. 1st sess. Washington: GPO, 2009 (statement of Phyllis K. Fong, Inspector General, United States Department of Agriculture Office of Inspector General).

# Finding 1:  SBA Needs to Effectively Monitor Loan Agent Participation and Mitigate Risk of Fraud and Loss

Over the last 20 years, SBA has implemented a series of controls to mitigate the risk associated with loan agent participation, and to protect program participants and taxpayers from fraud and abuse. Specifically, the Agency established the following controls:

- Regulations requiring disclosure of loan agent participation;[16]
- Fee disclosure form and compensation agreement (Form 159);[17]
- Requirements for lenders to verify historical financial information against tax transcripts;
- Policies and procedures supporting causes for suspension and debarment of loan agents;[18]
- Database to track Form 159 disclosures for the 7(a) Program, which has the highest amount of loan agent activity;
- Proposed revisions to existing regulations over loan agent revocation and suspension procedures.[19]

However, despite SBA's improvements, its controls were not adequate to monitor loan agent involvement and mitigate the risk of loss and fraud in the 7(a) Program.  According to OMB, agencies must have monitoring, diagnostic, and reporting mechanisms in place to provide senior-level policy officials and credit program managers a clear understanding of a program's performance.[20]  Such mechanisms should regularly collect, analyze, and report key information and trends and also be sufficiently flexible to deliver any analysis that would help agencies identify and respond appropriately to developing issues in the portfolio.

In line with these requirements, SBA has an established objective in its strategic plan, stating that "…SBA has an extraordinary responsibility to taxpayers to mitigate risk and conduct oversight of its programs."  Within SBA, much of this responsibility falls to OCRM.  As the SBA office responsible for credit program oversight and risk management, OCRM's mission is to maximize the efficiency of SBA's lending programs by effectively managing program credit risk, monitoring lender performance, and enforcing lending program requirements.  In support of its risk management function, OCRM has also been delegated the authority for loan agent enforcement, including suspension and revocation.[21]

While SBA established a method to track loan agent activity from compensation agreement disclosures (Form 159), they had not established procedures specific to monitoring and assessing loan agent activity and risk.  Over the last 10 years, SBA developed a number of methods to collect loan agent information in a searchable, electronic format for oversight and risk management purposes with limited success.  During this time, the scope of OCRM's loan agent oversight activities has generally been limited to lender on-site reviews.  However, according to OCRM officials, the on-site review process could not effectively evaluate loan agent activity and their performance in SBA programs.  Further, we determined that although previously recommended, SBA had not established performance metrics to identify loan agent risk.

---

[16] Code of Federal Regulations, Title 13. *Business Credit and Assistance*, Part 103.5.
[17] SBA Form 159, *Fee Disclosure Form and Compensation Agreement* (SBA 7(a) Loan).
[18] SOP 50 53 (A), *Lender Supervision and Enforcement*.
[19] Federal Register Vol. 79 No 200.
[20] OMB Circular A-129, *Policies for Federal Credit Programs and Non-Tax Receivables* (January 2013).
[21] SOP 50 53 (A), *Lender Supervision and Enforcement* (effective June 1, 2012).

As part of its portfolio risk management program, OCRM stated it will focus on identifying program risks, especially the risks related to loan agents.  However, because gathered data has not been reliable (see Finding 2), SBA analyses using data from compensation agreements have been ad-hoc or lender-specific in nature.  We determined that an effective system for monitoring and tracking loan agent performance could have limited SBA's exposure to fraud and loss.  For example, we analyzed the performance of the loans associated to the six case examples in Table 1.  We found that an effective system for monitoring and tracking of loan agent activities could have identified performance trends in at least two of the cases, which could have prevented the approval of additional fraudulent SBA loans and losses.

Even with incomplete and erroneous data, we were able to identify loan agents with concerning performance.[22]  In most instances, the loan agents did not appear to be receiving compensation for the origination of new 7(a) loans.  However, we noted one loan agent who, despite a history of concerning performance, continued to facilitate the origination of numerous 7(a) loans with different lenders.  This loan agent is associated with SBA loans currently under investigation by OIG.

SBA officials noted that they hold the lenders primarily accountable for monitoring the loan agents that they conduct business with.  We agree that the primary responsibility for monitoring loan agents rests with the lenders.  However, only SBA is in a position to aggregate loan agent portfolios, evaluate their performance, and inform participating lenders about any identified risks or concerning trends.  As demonstrated in the significant fraud schemes since 2005, loan agents have targeted multiple SBA lenders, who would be unaware of loan agents' past performance or activity with other lenders.[23]  For example, our analysis determined that one loan agent that fraudulently originated $90 million in SBA loans received compensation from at least 19 different lenders.

By compiling loan agent data from across multiple portfolios, SBA could provide much-needed insight and oversight.  For example, the Department of Housing and Urban Development (HUD) has developed a model that can assist both the Agency and participating lenders in their oversight activities.  According to HUD officials, they collect loan agent data in their borrower forms and are able to aggregate the data to provide a searchable portal to be used by their participating lenders.  The portal contains performance metrics for various types of agents that are active in HUD programs.  Additionally, HUD officials noted that they felt that it was prudent to present the performance information for use by lenders, who they ultimately hold accountable.

According to the Government Accountability Office (GAO), internal controls serve as the first line of defense in safeguarding assets and preventing and detecting errors and fraud.  Additionally, revised guidance from GAO, effective in 2016, states that management analyzes and responds to identified fraud risks so that they are effectively mitigated.  SBA has stated that it takes a zero tolerance stance on fraud, waste, and abuse in all of its programs.[24]  Until it collects reliable loan agent information and establishes regular performance monitoring, the Agency may not be able to detect potential fraud and specific loan agents that have a history of unacceptable or poor performance on SBA loans.

---

[22] For purposes of our analysis, we considered loan default rates greater than 15 percent to be concerning performance as this rate was more than 5 times the default rate for 7(a) loans between December 1, 2010 and September 30, 2014.
[23] See Table 1.
[24] SBA's *FY 2016 Congressional Budget Justification* and *FY 2014 Annual Performance Report*.

**Recommendations**

We recommend that the Office of Credit Risk Management:

1. Establish and implement procedures for the regular monitoring of SBA Form 159 data to identify concerning trends or risk patterns.

2. Develop performance metrics for loan agents that, if exceeded, would trigger closer SBA examination of a loan agent's activity and performance.

3. Establish and implement procedures for reporting any concerning trends or suspected fraudulent activity of loan agents to Agency management and OIG.

4. Determine whether it is feasible to establish a report to provide participating lenders with information on loan agents and their performance.

## Finding 2:  SBA Did Not Establish Adequate Controls Over Form 159 Data Collection and Reporting Processes

One of the reasons it has become difficult for SBA to track and monitor loan agent activity and performance is due to missing or erroneous loan agent data.  Without complete, reliable data, SBA does not have enough information to identify loan agents, their compensation, or any concerning trends related to their activity or performance.

Since 2000, when OIG first identified tracking loan agent participation as a management challenge, SBA has implemented an electronic process to submit Form 159 data on 7(a) loans.  When a loan agent enters into an agreement with an SBA participating lender or applicant, the lender is required to provide and disclose information—such as the SBA loan number, service provided, agent(s) compensated, and the amount(s) paid—in a compensation agreement.  This form is submitted to SBA's fiscal transfer agent (FTA), who then inputs this data into a database and periodically submits the information to SBA.[25]

Despite establishing this process, we found that SBA did not have the internal controls in place to ensure that this data was reliable and accurate enough to monitor loan agent activity.  According to OMB, agencies are responsible for establishing internal controls over information systems, like edit checks, that will ensure that data is accurate and complete, and that transactions are properly authorized and processed.[26]  OMB also requires agencies to monitor whether these internal controls are effective, and to conduct periodic reviews including reconciling, comparing, and assessing data.  SBA's own internal control procedures require that financial, statistical, and other reports—such as the periodic reports from the database—be accurate, timely, and reliable in order to maintain accountability and managerial control.[27]

During the course of our audit, we determined that SBA faced data challenges at two levels: (1) the accuracy of compensation agreement data recorded by the FTA; and (2) the completeness of information submitted by lenders on the compensation agreement forms.

### Data Quality within the Compensation Agreement Database

SBA did not implement proper controls over data input and validation for the compensation agreement database.  According to an estimate by SBA officials in 2014, information in the compensation agreement database may have only been 50 to 60 percent accurate.  In 2013, OCRM requested one of its contractors analyze the database in order to determine the nature and extent of the data errors.  The contractor identified serious deficiencies in data integrity and general data quality, rendering the data set nearly unusable for purposes of data manipulation and cross-referencing with other data sets.[28]  Further, the contractor noted that the lender name field, which is key for SBA analysis, included 2,161 errors including extra spaces, misspellings, improper punctuation, and duplicates.  This represented an error rate greater than 60 percent.

---

[25] SOP 50 10 5 (F), *Lender and Development Company Loan Programs* (January 1, 2014).
[26] OMB Circular A-123, *Management's Responsibility for Internal Control* (December 21, 2004).
[27] SOP 00 02 2, *Internal Control Systems* (January 1986).
[28] Fuentez-Fernandez & Associates, *Evaluation of Data Submitted by 7(a) Lenders Using Form 159 as Reported by Colson. Services Corporation for the Period December 2010 to December 2012.*

We conducted our own analysis of the data recorded between December 2010 and September 2014 and determined that of the 51,000 records during that period:

- 28 percent contained missing or inaccurate loan number information;
- 23 percent that indicated referral agent involvement had incomplete information related to the agent or their compensation; [29] and
- 7 percent did not disclose any compensation amounts.

In total, we found that approximately 19,000, or 37 percent, of the 51,000 Form 159 records contained critical errors that would limit SBA's ability to conduct effective oversight (See Figure 1 below for details on errors affecting the 19,000 records). As a result, we determined that the compensation disclosure database was materially inaccurate.

**Figure 1: Types of Errors Noted**



Source: OIG analysis of SBA Form 159 database maintained by the FTA

Further, we noted that the loan agent name field(s) contained as many as 19 different spellings of the same agent. Errors like incorrect loan agent names would hinder efforts to monitor comprehensive data for that loan agent. In addition to analyzing the data, we selected a small sample of Form 159 records to compare to source documentation. This comparison indicated that 35 percent of the records reviewed had critical recording errors by the FTA, which would further impact SBA's ability to perform appropriate monitoring. When considering even minor errors, 60 percent of the sampled items had at least one exception noted, where the data recorded and original Form 159 information did not agree.

Based on our interviews with Colson and SBA officials, we determined that poor data quality was due to the fact that SBA had not provided adequate requirements, instructions, or guidance to the FTA for ensuring and maintaining the data's integrity. As a result, the FTA's controls were extremely weak; for example, the FTA did not have a check to ensure that the loan number was a valid 10-digit number or a check that all fields were complete. SBA did not require the FTA to have a follow-up process or procedures that would require the FTA to identify and correct errors and omissions in form data submitted by lenders.

The quality of the data is further impacted because loan agents cannot be uniquely identified. In 2004, SBA determined that it faced restrictions on the type of information it could use to uniquely identify loan agents. At this time, SBA has not assigned unique identifiers to loan agents. For loan agents with complex names or operating under various names, it is more likely that different names or spellings may be put into the database, making oversight more difficult.

---

[29] A referral agent can act on behalf of an applicant or a lender, and is a type of loan agent.

## Lender Noncompliance with SBA Form Requirements

SBA has also faced longstanding issues with receiving accurate and complete compensation agreement forms from participating lenders. Agency officials we interviewed estimated that only about 60 to 70 percent of the compensation agreement forms were being submitted by lenders. Since 2011, OCRM has issued lender risk-based review findings for 63 lenders, with the majority of the findings centering on whether the form was completed and/or submitted to the FTA. For lenders using loan agents, this in turn could mean that the lenders' forms—which were either incomplete or not submitted—did not provide important loan agent information.

We reviewed the 63 lenders that OCRM identified in its findings as noncompliant and found that 26 percent used loan agents within their SBA lending programs. Further, OIG interviews with 7 of the top 30 lenders in the 7(a) Program revealed that many were not submitting the compensation agreement form to the FTA. One of the top 30 lenders, who stated it used loan agents in approximately 85 percent of its transactions, disclosed that it had not submitted any of its Form 159s. We estimated that the lender did not submit over 500 compensation agreements to the FTA, or approximately 1 percent of the entire form database.[30] Similarly, another lender either did not report or did not properly disclose compensation paid to a specific loan agent on 9 of the 14 loans we reviewed—64 percent.

In other instances, lenders submitted the forms, but with incomplete data. Specifically, one top 30 SBA lender did not include loan numbers for approximately 800 of its form submissions—80 percent. While we found compliance issues were prevalent among 7 top lenders we interviewed, when speaking with other prominent SBA lenders, we noted similar Form 159 compliance issues.

While we were unable to determine a direct cause for why lender forms were incomplete or not submitted, representatives from a leading industry trade association focused on SBA lending programs stated that SBA's policy did not adequately or consistently define various types of loan agents based on their role in the transaction. Consequently, lenders may not have known whether an individual or business qualified as a loan agent, and therefore required a compensation agreement. Lenders we interviewed also acknowledged that due to gaps in their procedures, they did not include loan numbers on the form or submit them to the FTA.

As long as the information on loan agents is materially incomplete, SBA will be limited in its ability to perform oversight and cannot fully evaluate loan agent activities for risk of fraud and loss. Further, SBA may not be able to identify and detect problem loan agents and loan agent relationships that do not meet SBA requirements.

## Recommendations

We recommend that the Office of Performance and Systems Management:

5. Issue a notice to SBA participating lenders clarifying the types of loan agent transactions and compensation requiring disclosure and SBA's requirements for lender submission of the information to SBA's FTA.
6. Develop benchmarks for contractor performance and require the FTA to implement appropriate application controls and follow-up procedures with lenders to ensure the integrity of the Form 159 database.

---

[30] Based on analysis of the lender's portfolio from December 1, 2010 to September 30, 2014,

7.  Perform a review of the Form 159 database in coordination with the FTA to identify and correct existing Form 159 data errors.

8.  Implement a process using permissible information to uniquely identify loan agents involved with SBA lending programs for tracking purposes.